COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| APC HOME HEALTH SERVICES, INC., | § | |
| | § | No. 08-18-00171-CV |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law Number Seven |
| | § | |
| LUCINA MARTINEZ, | § | Of El Paso County, Texas |
| | § | (TC# 2017DCV4119) |
| Appellee. | § | |

## O P I N I O N

This is an interlocutory appeal from the denial of a motion to compel arbitration. The trial court denied the motion without saying why. Consequently, there are a host of issues before us, including whether APC carried its burden to show the parties agreed to arbitrate the claims asserted here, and if so, whether Lucina Martinez carried her burden to substantiate any of the defensive theories she asserted below. Bound up with the later question is whether the agreement is governed by the Federal Arbitration Act (FAA), whether it is procedurally unconscionable, or whether certain provisions are substantively unconscionable. We reverse and remand with instructions.

## BACKGROUND

As its name suggests, APC Home Health Services, Inc. (APC) is a home health care provider. On May 1, 2016, and while employed by APC, Martinez was working at a patient's

1

home. While transferring the patient from a bed to a wheel chair, Martinez claims she injured her neck, back, and other parts of her body. She filed suit against APC, alleging a common law negligence cause of action. APC is a non-subscriber under the Texas worker's compensation system. APC answered and then moved to compel arbitration.

APC supported its motion to compel arbitration with the affidavit of Jovie Cantu, identified as APC's records custodian. Cantu's affidavit proved up as a business record an attached "Arbitration Agreement and Notice of Arbitration Policy." The agreement, dated April 20, 2016, bears the signature of a "Lucina Martinez"; the title and main body of the document are entirely in Spanish. APC attached another exhibit represented to be an English translation of the agreement. Its key terms include:

> **APC Home Health Service, Inc**. . . . ("Company," "we" or "our") maintains a mandatory binding arbitration policy. It is a condition of your employment with us that you and we agree to arbitrate all arbitrable claims arising from or related to your employment with us (the "Claims," itemized below), save and except any benefit claims arising under our Occupational Injury Benefit Plan, and any claims made not arbitrable by governing statute or rule.
>
> 1. **Effective Date**: The effective date of this Arbitration Agreement and Notice of Arbitration Policy (this "Arbitration Agreement") is 5/16/12 (the "Effective Date"). . . .
> If you are already working for Company when you receive notice of this Arbitration Agreement, and you continue working for us for more than three more days, you will be deemed to have accepted the terms of this Arbitration Agreement on the fourth day, and thereafter. In that event, the fourth day is your effective date to be governed by this Arbitration Agreement. **IF YOU CONTINUE TO WORK FOR US AFTER THE EFFECTIVE DATE, YOU AND WE WILL HAVE MUTUALLY AGREED TO ARBITRATE ALL COVERED CLAIMS BETWEEN US, APPLYING THE TERMS OF THIS ARBITRATION AGREEMENT.**
>
> 2. **Arbitration Is Mandatory, Binding, and Mutual**: All Claims related to your employment with us arising in any part after the Effective Date, save and except any benefit claims under our Occupational Injury Benefit Plan and any claims made not arbitrable by governing statute or rule, will be resolved only through mandatory binding arbitration. **You and we both agree to arbitrate all Claims, and you and we both waive all rights to a jury or non-jury trial in state and federal court as to the Claims**. [bolding and capitalizations all original]

2

The agreement was signed on April 20, 2016. The date of the accident is alleged as May 1, 2016.[1]

The agreement further describes what claims are governed by arbitration:

4. **The Claims**: Claims covered under this Arbitration Agreement include, but are not limited to the following: (i) claims arising from any injury suffered by an Employee while in the Course and Scope of Employment with Company, including but not limited to claims for negligence, gross negligence, and all claims for personal injuries, physical impairment, disfigurement, pain and suffering, mental anguish, . . . .

And further relevant here, the agreement includes this provision:

6. **How the Arbitration Will Be Conducted:** You and we agree Company is engaged in interstate commerce, and that the Federal Arbitration Act ("FAA") will govern all aspects of this Arbitration Agreement.

APC also provided its employees an occupational injury plan that provided defined medical and indemnity benefits. While the plan document has a space for the employee's signature, the plan in our record is unsigned. Nonetheless, APC included the affidavit of a claim's manager for Pan-American Life Insurance Company documenting that Martinez received $4,977.55 in indemnity benefits and $645.16 in medical payments under the terms of APC's Occupation Injury Benefit Plan.

Martinez opposed the motion to compel arbitration on several grounds: (1) the attached agreement was only a copy, and Martinez questioned its authenticity; (2) the FAA does not apply because there was no transaction involving commerce; (3) Congress never intended the FAA to supplant a state worker's compensation scheme; (4) enforcing the arbitration agreement through the FAA would violate the 10th Amendment; (5) the agreement is unconscionable; (6) pre-injury waivers for non-subscribers are void; (7) the agreement is illusory for lack of mutuality of

---

[1] The original petition alleged the accident occurred on May 1, 2015, which would have been before the agreement was signed. An amended petition, however, changed that date to May 1, 2016, and the various medical records filed with the court also recite that the latter date as the actual date of injury.

obligation; and alternatively, (8) the court should reform the agreement to remove any unconscionable provisions.

In support of its opposition, Martinez included her own affidavit that in relevant part attested:

- That she has "limited ability in reading, writing or understanding English."

- That all her work "was performed locally in El Paso, Texas."

- That she does "not remember signing" the arbitration agreement attached to APC's Motion to Compel Arbitration, nor does she "remember anything about this document."

Her affidavit also described the manner in which the agreement may have been executed:

- "When I began work for APC, I was required and told to sign things and I did not know why. I was told that the documents were routine paperwork or documents I needed to sign in order to work. I was misled into believing that the documents were not important and were just routine documents that the company needed to complete their paperwork on my employment. I did not know and I was never told by anyone at APC that what I was signing was an arbitration agreement or anything other than papers required to be signed for my job. I was never told that I could be waiving rights that I had or that I could seek the advice of an attorney before signing these documents. I was never told the documents contained an arbitration agreement. I was not given any time to review the documents prior to signing them. . . . No one from APC ever provided an orientation session or any other kind of meeting where any of the documents I was required to sign was explained. No one at APC ever explained or discussed any arbitration agreement to me. (CR 279-80)

The trial court held two hearings on APC's motion. At the first hearing, APC's counsel represented that it had a witness ready to testify that Martinez signed the arbitration agreement. The trial judge asked Martinez's counsel if Martinez denied signing the document. Her counsel responded that Martinez did not recall signing the document. The trial court found that assertion insufficient to raise an issue as to her signature, and the trial court stated that there was no need to call the witness to testify.[2]

---

[2] We find the following exchange at the hearing:

4

The trial court was more concerned with some of Martinez's defenses to the agreement, and particularly whether arbitration would have truly been a more efficient and less costly alternative to litigation, and if not, why an employer would choose that forum.[3] The trial court desired a full evidentiary hearing on the cost issue and directed APC's counsel to submit evidence on the likely cost of arbitration in this case. APC did so through a subsequent filing that included several documents summarizing studies on arbitration's cost savings. Martinez offered no evidence of her own on that issue. Following that second hearing, the trial court denied the motion to compel arbitration without issuing any findings of fact or conclusions of law. APC then brought this interlocutory appeal.[4] It asserts three issues: (1) whether the trial court erred in failing to compel arbitration; (2) whether Martinez met her burden to substantiate a defense to the arbitration agreement; and (3) whether the undisputed evidence shows that arbitration is a more cost-effective forum.

---

THE COURT: You have a document with her signature on it?
[APC COUNSEL]: Yes, Your Honor.
THE COURT: And you've got a witness who would say, "Yes, I was there and saw her sign it"?
[APC COUNSEL]: Yes, Judge.
THE COURT: Okay. I mean, I think for now I'm going to find that she did sign it. So I don't think you need to put on evidence on that issue.

[3] This same trial court had made numerous fact findings on that topic in another case involving other litigants. *See Whataburger Restaurants LLC v. Cardwell*, 446 S.W.3d 897, 907 (Tex.App.--El Paso 2014), *review granted, judgment rev'd*, 484 S.W.3d 426 (Tex. 2016), *on remand*, 545 S.W.3d 73 (Tex.App.--El Paso 2017, no pet.). We noted in the appeal of that case that the U.S. Supreme Court, the Texas Supreme Court, and this Court have all published opinions attesting in general to the efficiency and cost savings with arbitration. 545 S.W.3d at 80, *citing Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) (parties choose arbitration in part for its "lower costs, greater efficiency and speed"); *In re Poly–America, L.P.*, 262 S.W.3d 337, 347 (Tex. 2008) (orig. proceeding) (noting that arbitration is intended to provide a lower-cost, expedited means to resolve disputes); *In re Shredder Co.*, L.L.C., 225 S.W.3d 676, 679 (Tex.App.--El Paso 2006, no pet.).

[4] Whether the arbitration agreement is governed by the FAA or the Texas Arbitration Act, we have jurisdiction to hear an interlocutory appeal of the denial of a motion to compel arbitration. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 51.016 (permitting an interlocutory appeal from the denial of a motion to compel arbitration under the Federal Arbitration Act); TEX.CIV.PRAC. & REM.CODE ANN. § 171.098 (allowing appeal under the TAA).

## FRAMEWORK FOR REVIEW

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Stated otherwise, arbitration "is a matter of consent, not coercion[.]" *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). Accordingly, a party seeking to compel arbitration carries the burden to: (1) establish the existence of a valid arbitration agreement, and (2) demonstrate that the claims asserted are within the scope of the agreement. *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 605 (Tex. 2005); *Delfingen US–Texas, L.P. v. Valenzuela*, 407 S.W.3d 791, 797 (Tex.App.--El Paso 2013, no pet.).

If the proponent of arbitration has offered prima facia evidence for the existence of a valid agreement which covers the dispute, a presumption arises in favor of arbitrating the dispute, and the burden shifts to the resisting party to raise an affirmative defense to enforcing that agreement. *Ridge Nat. Resources, L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105, 118 (Tex.App.--El Paso 2018, no pet.); *see also Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 499 (Tex. 2015); *In re Poly–America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) (orig. proceeding).

Motions to compel arbitration are ordinarily decided in summary proceedings "on the basis of affidavits, pleadings, discovery, and stipulations." *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992). "However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts." *Id.* And as this Court has recently noted, "arbitration cases also involve more than simply handing an arbitration agreement to the trial court and asking for enforcement, or filing a defensive pleading with the trial

6

court asserting affirmative defenses to enforcement supported only by bare allegations." *Ridge Nat. Resources*, 564 S.W.3d at 132; *see also Royston, Rayzor*, 467 S.W.3d at 499 (rejecting unconscionability defense in part due to lack of evidence supporting same); *United Rentals, Inc. v. Smith*, 445 S.W.3d 808, 812 (Tex.App.--El Paso 2014, no pet.) (affirming denial of arbitration where employer failed to authenticate agreement).

We review a trial court's order denying a motion to compel arbitration for abuse of discretion. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 642-43 (Tex. 2009) (orig. proceeding). We defer to the trial court's factual determinations if they are supported by evidence but review its legal determinations *de novo*. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018), *cert. denied*, 139 S.Ct. 184 (2018). Because the trial court here did not enter findings of fact or conclusions of law to explain its denial of the motion to compel, we must uphold the trial court's decision on any appropriate legal theory urged below. *Bonded Builders Home Warranty Assn. of Texas v. Rockoff*, 509 S.W.3d 523, 531-32 (Tex. App.--El Paso 2016, no pet.); *Inland Sea, Inc. v. Castro*, 420 S.W.3d 55, 57-59 (Tex.App.--El Paso 2012, pet. denied) (affirming denial of motion to compel arbitration on alternative ground where order did not specify the basis for the ruling). Yet as a corollary, we are limited to considering the grounds presented to the trial court by the party resisting arbitration. *Ridge Nat. Resources*, 564 S.W.3d at 118; *Cardwell v. Whataburger Rests., L.L.C.*, 484 S.W.3d 426, 428 (Tex. 2016).

### APC MET ITS INITIAL BURDEN TO SHOW THE EXISTENCE OF AN AGREEMENT TO ARBITRATE

Courts determine whether an enforceable agreement to arbitrate exists by applying "ordinary principles of state contract law[.]" *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) *citing First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Delfingen*, 407 S.W.3d at 797. In order to demonstrate a binding agreement with Martinez under

7

Texas law, APC was required to show: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Ridge Nat. Resources*, 564 S.W.3d at 119-20, *citing Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 692 (Tex.App.--El Paso 2015, pet. denied).

APC met its initial burden to evidence an agreement to arbitrate in two ways. First, it presented the agreement supported by the affidavit of its records custodian. Second, when Martinez requested the original document as the best evidence of the contract, APC was prepared to present at the hearing a witness who would confirm the execution of the agreement by Martinez. The witness did not actually testify because Martinez's counsel affirmed that Martinez would only testify that she did not recall signing the document. Not recalling executing a document is different from denial of execution. *In re December Nine Co., Ltd.*, 225 S.W.3d 693, 699 (Tex.App.--El Paso 2006) (orig. proceeding) ("Mr. Estrada and Ms. Daher did not deny that they signed the acknowledgment form, but rather, only attested to not remembering signing these forms. We must agree with December Nine that their statements do not raise a fact issue as to the authenticity of the written instruments."). Moreover, our rules require a party challenging the authenticity of a signature on a document to file a verified pleading as a prerequisite to contesting execution of the document. TEX.R.CIV.P. 93(7) Martinez did not file a verified denial, nor insist on the presentation of the witness who was available at the hearing below and according to APC's counsel would have testified that Martinez actually signed the arbitration agreement. *Cf. Banda v. Garcia*, 955 S.W.2d 270 (Tex. 1997) (per curiam) (lawyer's unsworn statements can be treated as evidence if the lawyer makes the statements under circumstances in which the opposing party knows or

should know that an objection is necessary). Based on those predicates, we conclude, as apparently did the trial judge below, that Martinez signed the arbitration agreement.

And having concluded that Martinez signed the document, we are permitted a further inference that Martinez accepted the terms of the agreement. The fact that a party has signed a contract creates a strong presumption that the party has assented to its terms. *Ridge Nat. Resources*, 564 S.W.3d at 117-18; *Wright v. Hernandez*, 469 S.W.3d 744, 757 (Tex.App.--El Paso 2015, no pet.); *see also In re Dallas Peterbilt, Ltd., L.L.P.* 196 S.W.3d 161, 163 (Tex. 2006) (orig. proceeding) (at will employee who received notice of arbitration agreement and continued in employment bound by agreement); *ReadyOne Industries, Inc. v. Casillas*, 487 S.W.3d 254, 258 (Tex.App.--El Paso 2015, no pet.) (party signing a contract "is presumed to have read it and grasped its contents and legal effects").

In turn, the agreement itself reflects mutual promises to arbitrate, which is sufficient consideration to support an arbitration agreement. *In re 24R, Inc.*, 324 S.W.3d 564, 566 (Tex. 2010) (orig. proceeding). And the uncontested existence of the non-movant's signature on an arbitration agreement meets the evidentiary standard necessary to prove the prima facie existence of an arbitration agreement. *See id.* (noting that the arbitration agreement was signed by both parties and shifted its analysis to the non-movant's technical defect arguments regarding illusory promises); *Wright*, 469 S.W.3d at 757 (party's signature on contract creates a "strong presumption" that the party assented to the contract).

## THE ALLEGATIONS FALL WITHIN THE SCOPE OF THE AGREEMENT TO ARBITRATE

Martinez's suit alleges she injured herself in a workplace accident. The arbitration agreement expressly includes that type of claim as governed by the agreement. Martinez did not contest below, nor on appeal, that her workplace injury claim would fall within the scope of the

9

arbitration agreement. That leaves for our consideration the defenses that Martinez asserted below.[5]

## THE FAA APPLIES

Enforcement of the arbitration agreement first turns on whether the FAA applies. Under Texas law, an arbitration agreement is generally enforceable, but if it governs a personal injury claim, the agreement must be approved by both parties and their attorneys. TEX.CIV.PRAC. & REM.CODE ANN. § 171.002(a) (3) and (c); *In re Swift Transp. Co., Inc.*, 311 S.W.3d 484, 491 (Tex.App.--El Paso 2009) (orig. proceeding). And here, no attorney signed this agreement. APC avoids the Texas statute, however, if the FAA applies, because the FAA preempts conflicting state law. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011) ("When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA."); *Southland Corp. v. Keating*, 465 U.S. 1, 15-16 (1984) ("In creating a substantive rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements.") (footnotes omitted).

Section 2 of the FAA provides in pertinent part:

A written provision in any maritime transaction or a *contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

---

[5] While Martinez raised a number of defenses below, some have been collapsed together, and some have not been pursued on appeal. For instance, Martinez raised a 10th Amendment argument below that has not been briefed on appeal, likely because the Texas Supreme Court has expressly rejected it. *In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 423 (Tex. 2010) (orig. proceeding) ("[W]e conclude that the Federal Arbitration Act does not violate the Tenth Amendment by encroaching on a state power to enact and regulate its own workers' compensation system."). We appreciate counsel's focus on the potentially viable remaining issues in the case.

10

9 U.S.C. § 2 (emphasis supplied).  Both below and on appeal, Martinez focuses on the requirement that APC must show a "contract evidencing a transaction involving commerce" to sustain application of the FAA.

The U.S. Supreme Court has interpreted the term "involving commerce" in the FAA "as the functional equivalent of the more familiar term 'affecting commerce'--words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam); *see also In re L & L Kempwood Assocs.*, *L.P.,* 9 S.W.3d 125, 127 (Tex. 1999) (per curiam) (orig. proceeding) (the FAA extends to any contract affecting commerce, as far as the Commerce Clause of the United States Constitution will reach); *In re Big 8 Food Stores, Ltd*., 166 S.W.3d 869, 880 (Tex.App.--El Paso 2005, orig. proceeding) (same).

We note that APC's motion provided no actual proof, other than the parties contractual recitation, that APC was engaged in interstate commerce.  That is, unlike many of the cases where courts have found the FAA to apply, there was no affidavit or other proof that the underlying transaction or employer's business involved interstate commerce.  *See e.g*. *Jack B. Anglin,* 842 S.W.2d at 269-70 (affidavit stating that Anglin transported materials across state lines pursuant to the contract and prepared billings for the job in Michigan);  *ReadyOne Industries, Inc. v. Flores*, 460 S.W.3d 656, 662 (Tex.App.--El Paso 2014, pet. denied) (evidence that employer regularly engaged in interstate commerce through purchase and receipt of goods and services from outside Texas, and through the manufacture and shipment of goods outside of the state); *In re Border Steel, Inc.,* 229 S.W.3d 825, 830-31 (Tex.App.--El Paso 2007, orig. proceeding [mand. denied]) (holding that relationship between employer and employee "unquestionably affected interstate commerce" when employer recruited and advertised outside Texas, purchased goods and services from other

11

states, and served customers in various states). But we do not read Martinez's argument below to more simply claim that the APC's motion lacks proof that it is in fact involved in interstate commerce. Rather, she bases her argument on *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198 (1956) and argues that a court must focus on the employee's specific role in interstate commerce.

In *Bernhardt,* the plaintiff entered into an employment contract in New York to manage a company facility in Vermont. *Id.* at 199. The employment contract contained an arbitration provision. *Id.* Following his discharge, Bernhardt sued the employer in a Vermont state court for breach of contract. *Id.* The Second Circuit held that the FAA applied to the employment contract, but the Supreme Court reversed because it concluded that the contract did not evidence a transaction involving commerce within the meaning of Section 2 of the FAA. The Court reasoned that there was no evidence that Bernhardt, while performing his duties under the employment contract, was working in commerce, producing goods for commerce, or was engaging in activity that affected commerce. *Id.* at 200-01.

Building on this argument, Martinez also directs us to *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265 (1995) which discussed two views on the reach of the Commerce Clause. One view had looked to the "contemplation of the parties" as the litmus test as to whether a contract involves interstate commerce. *Id.* at 269-70. The other competing view focused on whether "the transaction (that the contract 'evidences') must turn out *in fact*, to have involved interstate commerce." *Id*. at 277 (emphasis original). The Court adopted the "actually affected" view, which might suggest that Martinez's contract must actually affect interstate commerce. Finally, Martinez contends any effect on interstate commerce must be substantial, citing *United States v. Lopez*, 514 U.S. 549, 559 (1995) ("We conclude, consistent with the great weight of our case law, that the

proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce.").

Appealing as these arguments may be, we are constrained by precedent to reject them. We previously rejected the *Bernhardt* argument in *ReadyOne Industries, Inc. v. Flores*, based in part on the parties' contract language that the "FAA governs all aspects of this Agreement." 460 S.W.3d at 662. We noted that "[i]t is well established that parties may expressly agree to arbitrate under the FAA." *Id.*, *citing In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011) (orig. proceeding) and *Lucchese, Inc. v. Solano*, 388 S.W.3d 343, 348 (Tex.App.--El Paso 2012, no pet.); *see also In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 605-06 & n.3 (Tex. 2005) (per curiam). Martinez responds that such a contract provision is at best a choice of law clause, and it cannot confer Commerce Clause power that Congress never had in the first place. But the contract here goes one step further. Aside from agreeing to the application of the FAA, it also confirms that APC is engaged in interstate commerce: "You and we *agree Company is engaged in interstate commerce*, and that the Federal Arbitration Act ('FAA') will govern all aspects of this Arbitration Agreement (emphasis added)." Martinez's affidavit, which only states she did her work in El Paso, does not undermine that contractual recitation. That is, APC could well be engaged in interstate commerce, and Martinez could have also performed all her work in El Paso. *See In re Border Steel, Inc.*, 229 S.W.3d at 831 ("[E]ven if no Border Steel employee worked outside the State of Texas, that fact alone would not preclude the company's affecting interstate commerce.").

Further, Martinez's argument that it must be *her* work that substantially affects interstate commerce has in our view been rejected by the U.S. Supreme Court. Two cases make the point. In *Citizens Bank v. Alafabco, Inc.*, a debtor sued its bank over several debt-restructuring transactions. 539 U.S. at 54. The bank invoked an arbitration clause in the debt instruments. The

13

Alabama Supreme Court refused to enforce the arbitration clause because it concluded the specific debt transactions were the relevant transaction and by themselves, they did not have a substantial effect on interstate commerce. *Id.* at 55. The U.S. Supreme Court disagreed, however, and held the lower court's focus on the specific contract at issue was misplaced: "Congress' Commerce Clause power may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice subject to federal control." *Id.* at 56-57 (internal quotes and ellipsis omitted). Rather, "[o]nly that general practice need bear on interstate commerce in a substantial way." *Id.* The Court found that the "general practice" was met on the record before it based in part on the debtor's other interstate activities and the "broad impact of commercial lending on the national economy[.]" *Id.* at 57-58.

More recently, the Court decided *Taylor v. United States*, 136 S.Ct. 2074, 2079 (2016). The question in *Taylor* was whether the government had proved its case that the accused committed a robbery that affected commerce--a predicate act required by the statute under which the defendant was convicted. *Id.* at 2077-78. The defendant had targeted two marijuana stash houses for home-invasion, but ended up taking only jewelry, $40, two cell phones, and a marijuana cigarette from one heist and only a cell phone from the other. *Id.* at 2078. The defendant challenged whether this minimal plunder could have truly affected interstate commerce. *Id.* The Court responded that "there are three categories of activity that Congress may regulate under its commerce power: (1) 'the use of the channels of interstate commerce'; (2) 'the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities'; and (3) 'those activities having a substantial relation to interstate commerce, ... *i.e.,* those activities that substantially affect interstate commerce.'" *Id.* at

14

2079, *quoting United States v. Lopez*, 514 U.S. 549, 558–559, (1995). The Court has held that activities in the third category, "may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal." *Id.*, *citing Wickard v. Filburn,* 317 U.S. 111, 125 (1942). So, while the individual crime netted only a few stolen items, the aggregate trade in marijuana is substantial and certainly a matter of commerce. *Id.* at 2080.

Likewise, even if Martinez's role in her company be slight, the company's business could play a substantial role in commerce and support Congress's interest in the arbitration of these kinds of disputes. That is essentially our holding in *In re Big 8 Food Stores* where we wrote: "that the relationship between an employer who is regularly engaged in activities related to interstate commerce and its employees is affected by interstate commerce as a matter of law and implicates commerce clause issues." *In re Big 8 Food Stores, Ltd.*, 166 S.W.3d at 880 (rejecting analysis that would look at how individual part-time employee affected commerce).

We conclude here that the trial court could not have rejected the FAA's application, and thereby invalidate the arbitration agreement under the TAA.[6]

## UNCONSCIONABILITY

Martinez also raised below an unconscionability defense. An arbitration agreement might be attacked as either being (1) procedurally unconscionable (referring to the circumstances surrounding the adoption of the arbitration provision) or (2) substantively unconscionable

---

[6] The Supreme Court's jurisprudence is not without strident dissenting opinions that question the reach of the Congress's Commerce Clause power and its application to cases filed in state courts. *See e.g. Taylor*, 136 S.Ct. at 2082 (Thomas, J., dissenting) ("The Court's holding creates serious constitutional problems and extends our already expansive, flawed commerce-power precedents."); *Dobson*, 513 U.S. at 285 (Scalia, J., dissenting) ("Adhering to [Southland Corp. v. Keating] entails a permanent, unauthorized eviction of state-court power to adjudicate a potentially large class of disputes."). Martinez has preserved her challenges to this jurisprudence which we of course have no ability to grant.

15

(referring to the fairness of the arbitration provision itself). *In re Halliburton Co.*, 80 S.W.3d 566, 571 (Tex. 2002).

Unconscionability has no precise legal definition because it is not a concept, but a determination made in light of a variety of factors. *Southwestern Bell Telephone Company v. DeLanney*, 809 S.W.2d 493, 498 (Tex. 1991) (Gonzalez, J. concurring). "The grounds for substantive abuse must be sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural abuse--the circumstances surrounding the negotiations must be shocking." *Delfingen*, 407 S.W.3d at 798.[7]

## Procedural Unconscionability

In deciding whether a contract is procedurally unconscionable, we look to: "(1) the entire atmosphere in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the non-bargaining ability of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable." *Bonded Builders*, 509 S.W.3d at 534, *quoting Delfingen,* 407 S.W.3d at 798 (internal quotation marks omitted). We determine *de novo* whether an agreement fails this standard, but we defer to the trial court's fact-findings if they are supported by the evidence. *Delfingen*, 407 S.W.3d at 798.

We begin with several guideposts governing Martinez's claim. First, the fact that parties would choose arbitration over a judicial forum is of no consequence, because there is nothing *per se* improper with arbitration; Texas public policy has long favored it. *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90-91 (Tex.1996) (per curiam). Second, unequal bargaining power does not

---

[7] The unconscionability defense has a long history at common law; an early decision described an unconscionable contract as one that "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Earl of Chesterfield v. Janssen*, 28 Eng. Rep. 82, 100, 2 Ves. Sr. 125, 155 (1751), *quoted in Venture Cotton Cooperative v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014).

establish grounds for invalidating an arbitration agreement absent a well-supported claim that the agreement resulted from the sort of fraud or overwhelming economic power that would provide grounds for revocation of any contract. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) ("Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context."); *In re Halliburton Co.*, 80 S.W.3d at 572 (holding an arbitration agreement was not unconscionable simply because an employer made a "take it or leave it" offer to its at-will employees). Third, the fact that a person does not read an agreement that they have signed (and are thus unaware of its terms) does not render the agreement unconscionable. *In re Border Steel*, 229 S.W.3d at 835; *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 134 (Tex. 2004). Fourth, the party seeking to invalidate the arbitration agreement must overcome the strong presumption in favor of such clauses. *See Mancias*, 934 S.W.2d at 91 ("Based on this record, we cannot conclude that Gonzalez met his burden to overcome the strong presumption favoring arbitration under the FAA."); *see also In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 892 (Tex. 2010) ("We should be wary of setting the bar for holding arbitration clauses unconscionable too low.").

Our cases have focused on circumstances when the employee lacked the means to understand the terms of the agreement and misrepresentations were made about the nature of what they were signing. *Cf. Delfingen*, 407 S.W.3d at 801–02 (worker was illiterate in English, no Spanish language version was available, and terms were misrepresented to him) *with ReadyOne Industries, Inc. v. Casillas*, 487 S.W.3d at 262 (Spanish language version available and no evidence of misrepresentation of any terms); *ReadyOne Industries, Inc. v. Flores*, 460 S.W.3d at 666–67 (same).

17

Here, there is no fact issue raised about Martinez's ability to understand the document. She asserted in her affidavit that she has limited English language skills, but the agreement she signed was in Spanish. The only assertion of any misrepresentation is that APC told her the documents were "routine paperwork or documents" that she needed to sign in order to work. According to her: "I was misled into believing that the documents were not important and were just routine documents that the company needed to complete their paperwork on my employment." The balance of affidavit focuses on what she was not told. The agreement's title which is all bolded, capitalized, underlined with enlarged fonts, reads: "**ACUERDO DE ARBITRAJE Y NOTIFICACIÓN DE NUESTRA POLÍTICA DE ARBITRAJE**" (and which translated means "Arbitration Agreement and Notice of Arbitration Policy"). The only affirmative representation that Martinez refers to is that she was told the documents were routine, which may well be true. Her conclusion that they were not important is either her own conclusion, or at best a subjective opinion that could not serve as a misrepresentation of a material fact.

The facts of the case here are similar to those of *In re ReadyOne Industries, Inc.*, 400 S.W.3d 164, 169 (Tex.App.--El Paso 2013, orig. proceeding). There, we disapproved of arbitration related discovery because the employee failed to raise a colorable basis for any kind of fraudulent inducement claim. The employee's evidence, like that here, consisted of claims that he: (1) did not recall anything about the arbitration agreement, (2) did not know what arbitration was, (3) did not speak English, and (4) was given lots of documents to sign and just signed them. *Id.* at 169. Similarly, the employee from *In re Border Steel* attempted to raise a procedural unconscionability claim based on a thirty-minute roll-out meeting for the arbitration plan that was presented in an English language Power-Point presentation to Spanish speaking workers. *In re Border Steel*, 229 S.W.3d at 835. We rejected the procedural unconscionability claim because

18

there was undisputed evidence that the employee signed a Spanish language version of the plan, and there was no evidence that the employee lacked mental capacity to enter into the contract. *Id.* And as here, the employee had actually accepted benefits under the employee benefit plan. *Id.* Finally, this Court in *Casillas* rejected an unconscionability claim based the employee's claim that he was: (1) required to sign many documents, (2) not given time to review them, and (3) not told of their contents. 487 S.W.3d at 262. We also noted there the absence of affirmative misrepresentation of the document's contents or any use of a trick or artifice to prevent employee from reading agreement. *Id.*

Finding no sufficient evidence to sustain a procedural unconscionability claim, we reject that as a potential basis to have denied APC's motion to compel arbitration.

### Substantive Unconscionability

Martinez also raised below a substantive unconscionability claim, but only in the alternative. That is, she asks that if the trial court was going to enforce the arbitration clause, that it strike three specific parts of the arbitration agreement: (1) a one-year time limit on bringing claims,[8] (2) limitations on discovery,[9] and (3) a provision that forbids punitive or exemplary damages. The arbitration agreement contains a severability clause that would permit the court to jettison any provision that is adjudged to be "invalid, illegal, or unenforceable, in whole or in

---

[8]  That provision reads:

> **One-Year Time Limit on Bringing a Claim:  All parties must file a Claim for arbitration within one (1) year after the date of the incident or occurrence giving rise to the Claim.**  Failure to do so will result in the Claim being barred as at that one-year date.  Should this time limitation become unenforceable because of applicable statute or case law, we and you agree the arbitrator may determine the appropriate limitations period in a pre-arbitration hearing,  [bolding, underlining and punctuation original]

[9] That clause provides that the Texas Rules of Civil Procedure generally apply, but each party can only depose the opposing party, one fact witness, and any expert designated by the opposing party.  The arbitrator can relax this limitation upon a good cause showing.

part[.]" Martinez carries this argument forward on appeal, asking this Court to strike those same provisions, or remand the matter back to the trial court to reconsider them.

Martinez principally relies on *In re Poly-Am., L.P.* In that case, the Texas Supreme Court addressed a number of ancillary clauses in an arbitration agreement between a worker and his employer. The worker had sued the employer for wrongful discharge, claiming it discharged him in retaliation for filing a worker's compensation claim. *Id.* at 345. By statute, the worker was provided a remedy for that cause of action under the Texas Labor Code. TEX.LAB.CODE ANN. § 451.001-.003. The worker had, however, agreed to arbitrate such claims, and the arbitration agreement further required: (1) any claim be asserted within one year from the relevant occurrence; (2) arbitration fees were to be split by the parties, but capped for the employee to no more than his monthly gross salary; (3) discovery was limited, to include only one oral deposition; and (4) the arbitrator could not award punitive, exemplary, liquidated damages, or to order reinstatement. *In re Poly-Am., L.P.*, 262 S.W.3d at 344.

The worker claimed that each of these ancillary provisions were substantively unconscionable. *Id.* at 345. The Texas Supreme Court agreed with the worker on some provisions, but not others. "An arbitration agreement covering statutory claims is valid so long as the arbitration agreement does not waive the substantive rights and remedies the statute affords and the arbitration procedures are fair, such that the employee may 'effectively vindicate his statutory rights.'" *Id.* at 349, *quoting In re Halliburton,* 80 S.W.3d 566, 572 (Tex. 2002); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985) (when parties agree to arbitrate a statutory claim, they do not "forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."). Under that rationale, the

20

*Poly-America* court concluded the limitation on remedies was substantively unconscionable. *In re Poly-Am., L.P.*, 262 S.W.3d at 352.

But the same court reached different conclusions on the fee splitting and discovery limitations. Noting that while fee splitting arrangements are not *per se* unconscionable, the court agreed that those which "operate to prohibit an employee from fully and effectively" vindicating their statutory rights are not enforceable. *Id.* at 356. The court further concluded that the arbitrator was in the best position to evaluate whether the costs would in fact hinder the employee vindicating his rights. Consequently, the trial court had not abused its discretion in declining to find otherwise. *Id.* at 357. Similarly, the trial court had not erred in failing to find the discovery limitations unconscionable. At the outset of the claim, the potential claims and defenses are evolving and "discerning the discovery limitations' potential preclusive effect is largely speculative" at that point. *Id.* at 358.

The arbitration agreement in *Poly-America* also included a clause that required written notice of the claim be filed within one year of the event giving rise to the claim. The worker claimed this provision was substantively unconscionable because it shortened the two-year statute of limitations applicable to claims of retaliatory discharge. *Id.* at 359. The court did not address the merits of that argument, however, because the worker had filed the case well within the one-year period and thus it could not have prejudiced him. *Id.*

We must also consider *who* should decide the unconscionability question. Three cases inform our decision. The U.S. Supreme Court recognized a distinction between questions of "substantive arbitrability"--which courts decide--and "procedural arbitrability"--which courts must refer to the arbitrators to decide. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 81 (2002). In *Howsam*, a brokerage firm argued that its client could not initiate an arbitration because

21

the client failed to do so within a six-year deadline that the parties had contractually included as part of their arbitration agreement. 537 U.S. at 81. The Court held that compliance with the time limit was not a question of arbitrability for the courts to decide. *Id.* at 83. "Linguistically speaking, one might call any potentially dispositive gateway question a 'question of arbitrability,'" but the Court explained that "the phrase 'question of arbitrability' has a far more limited scope" and does not encompass "'procedural' questions which grow out of the dispute and bear on its final disposition" or "allegation[s] of waiver, delay, or a like defense." *Id.* at 84. (citation omitted). Absent an agreement to the contrary, courts decide issues of substantive arbitrability such as "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Id.* at 81. Conversely, arbitrators decide issues of procedural arbitrability, such as "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id.* at 81.

The Court reaffirmed that approach more recently in *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25 (2014). The Court in *BG Group* analyzed whether a precondition to arbitration in an investment treaty between Argentina and the United Kingdom was procedural or jurisdictional in nature. *Id.* at 28-29. The provision required a claimant to submit a dispute to a local court and allow 18 months to lapse without a decision before submitting the dispute to arbitration. *Id.* Argentina alleged that the arbitrators did not have jurisdiction because BG Group initiated arbitration without waiting the requisite 18 months. *Id.* at 31-32. The Supreme Court found that the eighteen-month provision was procedural and not jurisdictional in nature, because it governed when the duty to arbitrate arose, rather than whether the duty existed at all. *Id.* at 35-36 ("The litigation provision is consequently a purely procedural requirement--a claims-processing

rule that governs when the arbitration may begin, but not whether it may occur or what its substantive outcome will be on the issues in dispute."). As a result, the Court held that satisfaction of the condition was for the arbitrators to decide, not the courts, because parties "normally expect a forum-based decision-maker to decide forum-specific procedural gateway matters." *Id.* at 34-35, *quoting Howsam*, 537 U.S. at 86.[10]

Our supreme court adopted this same view in *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 520 (Tex. 2015). The dispute there arose between a property developer and several insurance brokers over coverage on a development on South Padre Island. *Id.* at 509. When the insurance brokers named a general contractor, several sub-contractors, and an architect as responsible third parties, the developer added them into the lawsuit. *Id.* Those new parties were added after the two-year statute of limitations for a negligence claim had passed, but at the time, the law allowed a claimant to assert claims against a party designated as a responsible third party even though the statute of limitations had run. *Id.* at 510. The general contractor and sub-contractors all moved to compel arbitration based on their contract with the developer, which the trial court denied. *Id.* The court of appeals affirmed that decision because the contractor defendants had not demanded arbitration prior to a deadline (the running of applicable statute of limitations) that the contract expressly imposed. *G.T. Leach Builders, L.L.C. v. Sapphire, VP, LP*, 456 S.W.3d 570, 579 (Tex. App.--Corpus Christi 2013), *aff'd in part, rev'd in part sub nom. G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502 (Tex. 2015). The Texas Supreme

---

[10] The Court analogized the file-suit-first-then-wait-18-month requirement to other provisions that it and other courts had delegated to the arbitrators to decide. *BG Group*, 572 U.S. at 36, *citing Howsam*, 537 U.S. at 85 (six year time limit for initiating arbitration); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555-57 (1964) (mandatory pre-arbitration grievance procedure that involved holding two conferences); *Dialysis Access Center, LLC v. RMS Lifeline, Inc.,* 638 F.3d 367, 383 (1st Cir. 2011) (requirement for pre-arbitration "good faith negotiations"); *Lumbermens Mut. Cas. Co*. v. *Broadspire Management Servs., Inc*., 623 F.3d 476, 481 (7th Cir. 2010) (requirement for filing pre-arbitration "Disagreement Notice").

Court, disagreed, however, and concluded that whether the deadline for demanding arbitration applied "is one that the arbitrators--not the courts--must decide." 458 S.W.3d at 511.

The court's analysis is straightforward. Who decides disputes "is a question of the parties' intent as expressed in their written agreement." *Id*. at 519. Courts at the outset decide whether the parties have entered into a valid and enforceable arbitration agreement, and if so, whether the dispute falls within the scope of that agreement. *Id*. Texas courts also decide if a party has waived the right to arbitration by substantially engaging in litigation conduct. *Id*. at 520. But after that, a court should refer a matter to the arbitrator in whom the parties have entrusted their dispute. *Id*. In support of its reasoning, the *G.T. Leach* court cites both *BG Group* and *Howsam* to conclude that the arbitration demand deadline was a question for the arbitrator and not a court. *Id*. at 520-21. The *G.T. Leach* court wrote:

> In this case, the contractual deadline in the general contract falls squarely within the category of matters that 'grow out of the dispute and bear on [the arbitrators'] final disposition of the claims. The deadline does not determine the present existence, enforceability, or scope of the agreement to arbitrate the parties' disputes, but instead imposes a procedural limit on the parties' rights under that agreement. It bears on the arbitrators' final disposition of Sapphire's claims--specifically, whether the arbitrators can award Sapphire a remedy on its negligence claims in light of Sapphire's more than two-year delay in asserting them.

*Id.* at 521(internal cites and quotes omitted).

### *One-Year Time Limit*

Martinez's injury occurred on May 1, 2016. She first filed suit on November 27, 2017. The first request for arbitration in our record is APC's motion to compel arbitration filed January 25, 2018. Her suit is timely under the Texas two-year statute of limitations, but perhaps not if the arbitration agreement's one-year notice provision governs.

24

*G.T. Leach*'s holding might suggest that we out-of-hand reject Martinez's objection to the one-year time limit for initiating arbitration and punt that question back to the arbitrator. But the *G.T. Leach* court also wrote:

> We do not hold that disputes over a contractual deadline in an arbitration agreement will always present questions of procedural arbitrability that arbitrators must decide. If a party contends, for example, that a contractual deadline renders the agreement to arbitrate unconscionable or that the deadline operates to limit the scope of the claims the parties agreed to arbitrate, those contentions might raise issues of substantive arbitrability for the courts to decide.

*Id*. at 522.

And that is exactly what Martinez raised in her response below. Moreover, she asserted at least some evidence that might be germane to that claim.

Martinez's alternative motion to strike the one-year time limit would have come into play, however, only if the trial court had ordered arbitration. Because the trial court declined to order arbitration at all, it necessarily never passed on the question of the one-year time limit. Thus, we are left with two alternatives: decide the question as a matter of first impression, or remand to the trial court for its consideration. We choose the latter course, mainly because unconscionability questions are circumstance dependent and not all the circumstances are developed on this record. Unlike the relatively sophisticated litigants in *G.T. Leach*, *B.G. Group*, and *Howsam*, we know little about Martinez other than her claim that she had difficulties with the English language. It is unclear whether she ever had a copy of the arbitration agreement in her possession, whether she gave it to her lawyer, or whether she even saw a lawyer within a year of her injury. In other words, did she take a calculated gamble to pursue litigation over arbitration, or did she unwittingly fall into a trap created by the discrepancy between the Texas two-year statute of limitations for negligence claims and the one-year time limit found in the agreement? And are any of these circumstances, or potentially others, once developed, sufficient to rise to the level of substantive

25

unconscionability, or are they merely run of the mill circumstances that might guide the arbitrator in deciding the underlying dispute. We are cognizant of the need for expediently deciding disputes, particularly those where the parties have chosen arbitration as a quicker and less costly forum. We are disinclined, however, to place expediency over a thoughtful resolution of a potentially outcome determinative issue. *Cf. Serv. Corp. Int'l. v. Ruiz*, No. 13-16-00699-CV, 2018 WL 549196, at \*9 (Tex.App.--Corpus Christi Jan. 25, 2018, pet. denied) (mem. op., not designated for publication) (remanding undecided question of unconscionability defense back to trial court based on the undeveloped record).

## *Punitive Damages*

Conversely, we reject Martinez's attack on the punitive damages clause in the arbitration agreement for one simple reason: her last amended petition did not assert any claim for punitive damages. That renders any opinion on the viability of punitive or exemplary damages at this point advisory. To the extent further discovery in the arbitration factually allows for such a claim, the arbitrator can resolve the legality of the remedy limitation.

## *Discovery Limitation*

The arbitration agreement here limits the parties to one fact-witness deposition, but otherwise allows depositions of expert witnesses, the parties, and generally applies the Texas Rules of Civil Procedure. It also allows the arbitrator to relax these rules on a showing of good cause. Limits on discovery in arbitration provisions are typical and explain why arbitration is both quicker and less costly than litigation. *See In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692, 695 (Tex. 2008) (orig. proceeding). True enough, a discovery limitation that would prevent the effective presentation of a party's claim is substantively unconscionable, but Martinez made no showing at all that she meets that standard. The discovery limitation here applies to both parties

equally. *See In re Fleetwood Homes*, 257 S.W.3d at 695 ("We hold that arbitration's limits on discovery for *both* parties does not make it unconscionable."); *see also Pilot Travel Centers, LLC v. McCray*, 416 S.W.3d 168, 182 (Tex.App.--Dallas 2013, no pet.) (upholding agreement that applied equally to both sides and which provided for arbitrator to allow additional deposition upon a showing of good cause). And like the court explained in *In re Poly-America*, the actual import of a discovery limitation would only become evident once the parties actually undertake development of their claims and defenses. 262 S.W.3d at 357-58. Given that the discovery limitation clause here generally invokes the Texas Rules of Civil Procedure and has a good cause provision allowing the arbitrator to lift any restrictions, we conclude that any argument regarding unconscionability for the discovery limits here should be dealt with by the arbitrator.

## CONCLUSION

APC's first issue on appeal generally claims that the trial court erred in not granting its motion to compel arbitration. We sustain that issue. APC's second issue challenges whether Martinez met her burden on raising a valid defense to the arbitration agreement. We sustain that issue, except for the possible issue of whether the one-year time limit is substantively unconscionable and should be severed from the agreement. That specific question is remanded to the trial court to decide consistent with this opinion. After making that decision, the case should be abated or dismissed with an order that the parties pursue arbitration under the terms of their agreement. APC's third issue asked whether the trial court failed to consider undisputed evidence that arbitration is more cost effective than litigation. We do not consider that argument as part of Martinez's raised defense below. It is not urged by Martinez as a grounds for affirmance, and even if so, we would reject that claim based both on the record here, and prior decisional law.

27

ANN CRAWFORD McCLURE, Senior Judge

December 12, 2019

Before Rodriguez, J., Palafox J., and McClure, Senior Judge
McClure, Senior Judge (Sitting by Assignment)